CITIZENS FIRST NATIONAL BANK OF TYLER, Trustee Under the Will of L. A. Grelling of the Alden Grelling Trust No. 1, Plaintiff,

v.

UNITED STATES of America, Defendant.

CITIZENS FIRST NATIONAL BANK OF TYLER, Trustee Under the Will of Mae Kyle Grelling of the Alden Grelling Trust No. 2, Plaintiff,

v.

UNITED STATES of America, Defendant.

CITIZENS FIRST NATIONAL BANK OF TYLER, Trustee Under the Will of L. A. Grelling of the Mary John Spence Trust No. 1, Plaintiff,

v.

UNITED STATES of America, Defendant.

CITIZENS FIRST NATIONAL BANK OF TYLER, Trustee Under the Will of Mae Kyle Grelling of the Mary John Spence Trust No. 2, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 4447–4450.

United States District Court
E. D. Texas,
Tyler Division.

April 27, 1966.

Supplemental Opinion May 6, 1966.

## OPINION

SHEEHY, Chief Judge.

Each of the above cases is an action to recover income taxes and interest paid by the Plaintiff to Defendant. Since the cases present common questions of fact and of law, they were tried jointly before the Court without a jury. Most of the pertinent facts were stipulated by the parties by written stipulations filed as a part of the record in the cases. The pertinent facts, including many covered by the stipulations and those as found from the evidence offered at the trial, are as hereinafter stated.

On March 15, 1956, L. A. Grelling and wife, Mae Kyle Grelling died in an airplane crash. Both left wills with substantially similar dispositive provisions, under each of which the residue was left in trust for their two children, Mary John Spence and Louis Alden Grelling, Jr. Under each will the trust for Mary John Spence provides that she is to recover all income for her life and at her death the corpus is to pass free of trust to her descendants. As to the trust for Louis Alden Grelling, Jr., each will provides that the income, in the discretion of the trustee, may be accumulated until he is 21, and thereafter the income must be paid to him until age 30. At age 30 his trust is to terminate and he is to receive the corpus free of trust.

The trust established for Mary John Spence under the will of Mr. Grelling is termed the Mary John Spence Trust No. 1, and the trust established for her pursuant to the will of Mrs. Grelling is termed the Mary John Spence Trust No. 2. The trust established for Louis Alden Grelling, Jr. under the will of Mr. Grelling is termed the Alden Grelling Trust No. 1 and the trust established for him under the will of Mrs. Grelling is termed the Alden Grelling Trust No. 2. The Citizens First National Bank of Tyler is the sole executor and sole trustee under the wills of Mr. and Mrs. Grelling. In such capacity the Bank is the Plaintiff in each of these actions and for con-

Sam G. Winstead, Larry L. Bean, Dallas, Tex., for plaintiff.

Edward A. Copley, U. S. Dept. of Justice, Washington, D. C., Wm. Wayne Justice, U. S. Atty., Tyler, Tex., for defendant.

venience it, in such capacity, will be referred to hereinafter as the "Bank."

Substantially all of the property of the estates was community property and included producing oil and gas properties, some of which were located in the Good Omen Field situated in Smith County, Texas. The Grellings acquired their interest in the Good Omen properties a substantial period of time before their deaths. At the time of acquisition the properties were not developed. In the development of the properties the Grellings expended substantial sums and before their deaths collected substantial amounts of income from said properties. The Grelling estates acquired the working interest in the Good Omen Field owned by Mr. and Mrs. Grelling at the deaths of Mr. and Mrs. Grelling. The production in the Good Omen Field was from two formations, namely, the Pettit and the Woodbine formations.

During the administration of the estates the Bank for the purpose of raising money to pay Federal estate and State inheritance taxes levied upon the two estates, solicited offers to purchase certain producing oil and gas properties owned by the estates including those situated in the Good Omen Field. The offer was made to approximately 85 persons and/or firms, one of which was American Petrofina Company of Texas, hereinafter referred to as "FINA." By letter dated April 3, 1959, FINA submitted a proposal to the Bank to purchase the interest of the estates in the Good Omen (Pettit), Good Omen (Woodbine), Hainesville, East Hainesville and West Hainesville Fields. The offer stated in effect that the purchase price for the entire working interest of the estates in those properties was to be $800,000.00 in cash with the estates retaining a production payment in the amount of $1,200,000.00. This retained oil payment, which was to be payable from 35% of the gross production, was to commence after FINA had received $1,300,000.00 from the combined properties and was to cease prior to the estates receiving the $1,200,000.00 if the

total recoverable reserves were reduced to 109,000 barrels. Negotiations between the Bank and FINA continued and were consummated on the morning of April 17th as evidenced by a letter agreement dated April 17, 1959, which was written by Mr. Barnett, President of the Bank, and which was approved by FINA on April 18, 1959. The pertinent provisions of said letter agreement are:

"This will confirm our telephone conversation this morning in which we advised you of our acceptance of your proposal to buy the Grelling Estates interest in the Good Omen Field, both Woodbine and Pettit formations and developed and undeveloped leases, Smith County, Texas, for $820,000.00 cash, and a production payment of $1,-200,000.00 from 35% of the gross produced by the properties purchased by you after you have received $1,200,-000.00 gross revenue from the same properties, both production payments less severance taxes, applicable to each. The Estates are to receive gross revenue from the 35% interest until the principal amount of $1,200,000.00 has been paid or until the estimated remaining recoverable reserves in the reservoirs contributable to the properties conveyed are 109,000 barrels, whichever event occurs first and such determination of 109,000 barrels remaining reserves to be determined by a consulting engineer and geological firm, approved by the representatives of the Estates and you, and, of course, subject to your approval of titles to the properties involved, Petrofina to receive proceeds of oil and gas produced beginning April 1, 1959, and if purchase is not completed by May 1, 1959, Petrofina will deposit in escrow $820,-000.00 cash with the Citizens First National Bank of Tyler, pending the final closing of this transaction."

By its letter to the Bank dated April 30, 1959, FINA stated that the April 17 letter contained certain minor differences from FINA's original offer but that later conferences between FINA and

the Bank verified that there was no misunderstanding with respect to the offer.[1] There was transmitted with said letter FINA's check in the amount of $820,000.00 payable to the Bank to be held in escrow until such time as the transfer of the properties from the estates to FINA had been completed. The letter further stated in effect that some portion of the $820,000.00 cash payment, at the option of FINA, might be provided through the sale of a primary production payment from the property but that the terms of the sale of such production payment, the amount thereof and the purchaser were to be designated by FINA. As to the possible sale of a primary production payment, it was further stated in said letter:

> "In the event Grelling Estates furnish us satisfactory evidence of good and merchantable title to their undivided leasehold interest in such properties free and clear of all liens and encumbrances, and upon their execution and delivery to us, or our nominee, of satisfactory assignments and deeds conveying to us good and merchantable title in such properties free and clear of all liens and encumbrances and upon their otherwise complying with the terms of such offer, you are authorized to deliver the $820,000.00 to the Grelling Estates, unless at such time we authorize you to deliver to them less than the full $820,000.00, and we cause them to receive such reduced amount in cash from the sale of the primary production payment they have reserved from such properties *at our request*. (Emphasis supplied)

The Bank made no written reply to said letter of April 30 except to send to FINA its letter of May 1, 1959, which only acknowledged receipt of the letter and of the $820,000.00 check which was placed in escrow. However, upon receiving said letter of April 30, Mr. Barnett contacted by telephone Mr. Verne Maxwell, the Vice President of FINA, and the party who had represented FINA at all times in the negotiations for the purchase of the Grelling properties in question, and protested the statements contained in the letter of April 30 to the effect that some portion of the $820,000.00 cash payment to be paid by FINA for the Grelling estates properties might, at the option of FINA, be provided through the sale of a primary production payment from the property. Mr. Maxwell advised Mr. Barnett to the effect that under the "deal" between the Bank and FINA the Bank was to be paid $820,000.00 cash by FINA, that the Bank shouldn't pay any attention to the statements in the letter of April 30 to the effect that a portion of the $820,000.00 cash payment might be provided through the sale of a primary production payment and that the Bank was not to be concerned with the matter of the primary production payment as that was the concern of FINA. At all times after April 17, 1959, the Bank intended and believed that it was selling the estates' interest in the Good Omen property to FINA for $820,000.00 cash, retaining only a $1,200,000.00 production payment.

As indicated by its letter of April 30, FINA, sometime prior to April 30, 1959, employed the Tyler law firm of Ramey, Brelsford, Flock and Hull to examine the abstracts covering the Good Omen properties in question, to furnish current title opinions thereon and to assist in the preparation of the necessary assignments of said properties. Mr. Devereux of that firm performed the required title work and Mr. Brelsford of that firm undertook to assist FINA in the preparation of the assignments. In working on the forms of the assignments Mr. Brelsford was representing both the Bank and FINA.[2]

Between April 30, 1959, and June 1, 1959, FINA, for the purposes of assisting it in financing its purchase of the properties in question, made arrangements with the First National Bank in Dallas and Texas Charities, Inc. whereby Texas

---

1. The evidence fails to disclose what the "minor differences" were.

2. Such dual representation was with the knowledge and consent of both the Bank and FINA.

Charities was to purchase a $550,000.00 primary production payment payable out of 85% of the production attributable to the interest of the Grelling estates in the Good Omen Field being sold by the Bank to FINA, and the First National Bank in Dallas was to loan to Texas Charities the money with which to purchase said production payment. The Bank took no part in the negotiations leading up to the sale of the primary production payment to Texas Charities and knew nothing about such sale until FINA advised it that the sale had been made. It was FINA that made the decision as to the sale of said production payment to Texas Charities, Inc. and it was FINA that carried on all of the negotiations leading up to said sale and agreed to the terms thereof.

Various revisions of the assignment from the Bank to FINA were exchanged between Mr. Brelsford and FINA's Mr. Maxwell. The final form of such an assignment, which was prepared by Mr. Maxwell, was sent to Mr. Brelsford by FINA with its letter dated August 14, 1959. Such letter also included an instrument entitled "Conveyance of Primary Mineral Payment," which was also dated August 14, 1959. The assignment from the Bank to FINA was signed by FINA on August 14, 1959, and by the Bank on August 18. The instrument entitled "Conveyance of Primary Mineral Payment" was also signed by the Bank on August 18. The assignment from the Bank to FINA provides in effect for the conveyance of the working interest in the properties therein described to FINA by the estates with the retention of a primary production payment in the principal amount of $550,000.00, plus an amount equal to 5½% per annum calculated and payable monthly on the diminishing unpaid balance of such production payment. The assignment further provides for the retention by the Bank of a secondary production payment in the principal amount of $1,200,000.00 payable out of 35% of gross production, such production payment to commence after FINA has received $1,200,000.00 from gross production and such production

payment to cease after the full sum has been paid or after total recoverable reserves equal 109,000 barrels, whichever occurs first. The Bank has made no other sale of producing oil and gas properties owned by the Grelling estates. The instrument entitled "Conveyance of Primary Mineral Payment" in effect provides on its face for the conveyance of a $550,000.00 primary production payment by the Bank to Texas Charities, Inc. The latter instrument was not prepared by Mr. Brelsford or anyone in his firm but was prepared either by Mr. Maxwell or by Thompson, Knight & Simmons, a Dallas law firm that represents FINA generally. Both the assignment of the working interest retaining the production payments and the conveyance of the primary production payment were effective April 1, 1959.

On August 17, 1959, Mr. Barnett of the Bank, knowing that Mr. Brelsford was to go to Dallas in the next day or two in order to close the transaction between the Bank and FINA, instructed Mr. Brelsford to deliver the two instruments of conveyance executed by the Bank and referred to in the paragraph next above and to receive upon such delivery the total cash consideration in the amount of $820,000.00. On August 19, 1959, Mr. Brelsford delivered the instruments in Dallas and, upon such delivery, was delivered two checks payable to the Bank—one of which was FINA's check in the amount of $270,000.00 and the other was for $550,000.00 from Texas Charities, Inc. In order to purchase the primary production payment Texas Charities borrowed $550,000.00 from the First National Bank in Dallas and gave that bank its promissory note in that amount, which note bore interest at the rate of 5% per annum.

FINA took over the actual operation of the properties in question on or about May 1, 1959, and the Grelling estates paid no further expenses attributable to the operation of the properties after May 1959. Effective from April 1, 1959, FINA was billed for the expenses attributable to the estates' interest in the prop-

erties, and such expenses were duly paid by FINA. The estates received no income from said properties attributable to production after April 1, 1959. During the time of the negotiations of the sale of the properties in question and the consummation of such sale, representatives of the estates were negotiating on a gas contract with Sinclair Oil and Gas Corporation. In July 1959 the gas runs from May 1958 to May 1959 were paid to the estates which held them in suspense. On September 11, 1959, the estates accounted to FINA for 100% ·of the cash income from April 1 through August 1959 attributable to the estates' interest in the properties in question.

At the time of the assignment of the $550,000.00 primary production payment to Texas Charities it was reasonably foreseeable that such production payment would pay out. However, there is no evidence that shows or tends to show that there was either a likelihood or a possibility that the production from the Good Omen Field attributable to the Grelling interest that was purchased by FINA from and after April 1, 1959, the effective date of the sale of the Grelling interest to FINA, would be such that as much as $1,200,000.00 would be received for same. Therefore, it is not reasonably foreseeable that the estates will ever receive any payment on the secondary production payment in the amount of $1,-200,000.00 provided for in the assignment from the Bank to FINA.

In their tax returns for the fiscal year that ended February 29, 1960, the estates reported the sale of the Good Omen properties as a sale of a leasehold for $820,-000.00 with a retained production payment of $1,200,000.00, with one-half of the proceeds of such sale being allocated to the estate of Mr. Grelling, and the other one-half being allocated to the estate of Mrs. Grelling. In reporting such sale the Bank treated same as a sale of a capital asset under the provisions of Sec. 1221 of the Internal Revenue Code of 1954 and treated the gain from said sale as a long-term capital gain under the provisions of Sec. 1231 of the Internal Revenue Code of 1954. On February 26, 1960, the Grelling estates made partial distribution of the corpus to the four trusts involved in these actions in an amount in excess of $1,470,000.00. These distributions were made within Plaintiff's fiscal year that ended January 31, 1961.

Upon audit of the tax returns filed on behalf of the trusts for the fiscal year that ended February 29, 1960, the Internal Revenue Service determined that the sale of the properties in question constituted ordinary income that was subject to depletion to the extent of $550,000.00 (the amount Texas Charities paid for the primary production payment) which was treated as having been distributed pro rata to the four trusts and made deficiency assessments accordingly. As to the two Alden Grelling trusts, the assessed deficiency was in the amount of $68,990.82, plus interest in the amount of $10,951.89, or a total of $79,942.71 as to each of said trusts. As to the two Mary John Spence trusts, the assessed deficiency was in the amount of $48,686.27, plus interest in the amount of $8,752.19, or a total of $57,438.46 as to each of said trusts. The Bank paid each of said assessed deficiencies and the.interest thereon on June 4, 1964, and thereafter timely filed with the District Director of Internal Revenue, Dallas, Texas, on behalf of each trust a claim for refund in the amount of the assessed deficiency against the trust plus the interest thereon. Each of said claims for refund was rejected by the Internal Revenue Service on February 2, 1965. Thereafter, these actions were timely filed in this Court.

The Defendant contends, as the Internal Revenue Service determined at the time it assessed the deficiencies that are the subject matters of these actions, that $550,000.00 of the $820,000.00 received by the Bank upon the assignment to FINA of the Good Omen properties in question resulted from the sale by the Bank of a "carved out" production payment within the meaning of Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) and therefore is to be taxed as

ordinary income subject to depletion. The Bank, conceding in its brief that, as a general proposition, the proceeds of the sale of a "carved out" production payment is ordinary income subject to depletion, contends that it was FINA and not the Bank that sold the $550,000.00 primary production payment to Texas Charities, and, therefore, the holdings in the *Lake* case and the other cases relied on by the Defendant wherein similar holdings were made are not applicable to the instant cases.

Had the production payment not been sold to Texas Charities and FINA had paid the Bank the $820,000.00 cash that it placed in escrow, there would have been no question but what the $820,000.00 would have been treated as a long-term capital gain by the Internal Revenue Service because the Internal Revenue Service apparently raised no question as to the right of the Bank to treat as a long-term capital gain the $270,000.00 cash it received in the transaction over and above the $550,000.00 that was received as a result of the sale of the production payment to Texas Charities. The Defendant apparently concedes that if the sale of the production payment to Texas Charities had not been made by the Bank but had been made by FINA, the action of the Internal Revenue Service in treating the proceeds of the sale as ordinary income subject to depletion was erroneous because the Defendant, referring to the sale of said production payment, states on page 13 of its brief filed in these causes on March 19, 1966:

> "Thus, the Commissioner's action must be sustained unless the Court can find that the sale of the primary oil payment was not made by the taxpayer."

Thus, the primary question that must be determined is whether the sale of the primary production payment to Texas Charities was made by the Bank.

■ If the Court must look only to the two documents whereby the Grelling properties in the Good Omen Field were assigned by the Bank to FINA and the $550,000.00 primary production payment was assigned to Texas Charities, a finding and conclusion that the Bank made the sale of the production payment to Texas Charities is inescapable. However, in determining the question the Court is not so limited. As stated by Judge Wisdom in Weinert's Estate v. Commissioner, 5 Cir., 1961, 294 F.2d 750, 755:

> "The principle of looking through form to substance is no schoolboy's rule; it is the cornerstone of sound taxation, *especially of oil and gas transactions* which do not fit snugly into common law conveyancing forms. * * * The most persistent advocate of substance over form is, properly enough, the Commissioner of Internal Revenue. * * *
>
> "*Resort to substance is not a right reserved for the Commissioner's exclusive benefit, to use or not to use*—depending on the amount of the tax to be realized. *The taxpayer too has a right to assert the priority of substance*— at least in a case where his tax reporting and actions show an honest and consistent respect for the substance of a transaction.*" (Emphasis supplied)

In accordance with that rule this Court must proceed to determine the substance of the transaction in question, including the sale of the production payment to Texas Charities, and ascertain whether the transaction in substance was in fact different from that which it appears to be on the face of the instruments by which the Grelling interests in the Good Omen Field were assigned to FINA and the primary production payment was assigned to Texas Charities.

■ As a result of solicitations made by the Bank, FINA, by its letter of April 3, above referred to, submitted a proposal to purchase the interest of the Grelling estates in the Good Omen Field and certain other fields. This proposal was not acceptable to the Bank, and negotiations between the Bank and FINA continued until on the morning of April 17, 1959, when Mr. Maxwell, Vice President of FINA, had a telephone conversation with Mr. Barnett, President of the Bank,

wherein Mr. Maxwell offered on behalf of FINA to buy the estates' interest in the Good Omen Field for $820,000.00 cash and a production payment of $1,200,000.-00 from 35% of the gross produced from the properties after FINA had received $1,200,000.00 from such properties, unless the remaining reserves attributable to the properties should go as low as 109,000 barrels. Mr. Barnett, acting on behalf of the Bank, accepted such proposal and immediately wrote FINA the April 17 letter confirming the Bank's acceptance of FINA's proposal and set forth therein the terms of the sale. This letter was received and approved by FINA on the following day. The letter clearly designated the parties and their obligations and described the property that was the subject matter of the sale with the required degree of certainty. Consequently, upon FINA signing the letter and thereby noting its acceptance and approval of the terms stated therein, the letter became a valid binding contract for the sale of the Grelling estates' interest in the Good Omen properties and all rights and obligations of the parties to the letter agreement became fixed thereunder.

■ Under the terms of the April 17 letter agreement FINA was to pay the Bank $820,000.00 in cash for the properties therein described with the estates retaining the $1,200,000.00 secondary production payment on the terms stated in said letter. There is no provision in the letter with reference to the Bank receiving any part of the $820,000.00 through the retention and sale of a primary production payment such as was later purchased by Texas Charities. The contention of the Defendant that the reference in the April 17 letter agreement to "both production payments" constituted an agreement by the Bank to retain a primary production payment is without merit. Although the retention and sale of such a primary production payment was referred to in FINA's letter of April 3, above referred to, there is no evidence that shows or tends to show that any reference was made to such a primary production payment in the telephone conversation had between Mr. Maxwell and Mr. Barnett on the morning of April 17, 1959, wherein the proposal made by FINA to purchase the Grelling estates' interest in the Good Omen properties was accepted by the Bank. The fact that such a primary production payment was referred to in FINA's letter to the Bank of April 30 does not aid Defendant's contention because Mr. Barnett immediately, upon receiving said letter of April 30, contacted Mr. Maxwell, the author of the letter, and protested the statement contained in said letter to the effect that some portion of the $820,000.-00 cash payment to be made by FINA might be provided through the retention and sale of a primary production payment and was informed by Mr. Maxwell to the effect that the sale of such a primary production payment by the Bank was no part of the "deal" between the Bank and FINA. Mr. Barnett testified at the trial of these causes that the reference in the April 17 letter to "both production payments" related to the $1,200,000.00 secondary production payment to be retained by the estates and the $1,200,000.-00 of gross production to be received by FINA before the secondary production payment commenced. This is the more reasonable interpretation of the phrase and the Court finds that in referring to "both production payments" in the April 17 letter Mr. Barnett intended to and was referring to the $1,200,000.00 secondary production payment to be retained by the estates and $1,200,000.00 of gross production to be received by FINA before the secondary production payment commenced.

■■ It is settled law in Texas that a person who possesses the right to have the legal title to property transferred to him upon the performance of a specific condition or conditions has the equitable title to the property. Alworth v. Ellison, Tex.Civ. App., 1930, 27 S.W.2d 639, 640 (Writ of Error refused); and American National Insurance Company v. Bass, Tex.Civ. App., 1937, 111 S.W.2d 769, 771 (Writ of

Error dismissed). At any and all times subsequent to FINA's acceptance of the April 17 letter agreement on April 18, 1959, FINA had the right, upon the payment of $820,000.00 in cash, to have the Bank transfer the Grelling properties in the Good Omen Field to it, with the Bank retaining the $1,200,000.00 secondary production payment in the manner and on the terms set forth in the April 17 letter. Therefore, at all times between April 18, 1959, and August 19, 1959, when the Bank's assignment of the Grelling estates' interest in the Good Omen Field was delivered to FINA in Dallas, FINA held equitable title to the Grelling estates' interest in the Good Omen properties burdened with the estates' right to the secondary production payment in the amount of $1,200,000.00.

▉ As the equitable owner of the properties in question, FINA, from and after April 18, 1959, in substance, controlled the entire transaction. As above indicated, on or about the first of May it took over the operation of the properties for its own account and paid the operating expenses attributable to the properties in question. It also reimbursed the estates for all operating expenses incurred by the estates for the month of April 1959. It was FINA—not the Bank—that made the decision with reference to the primary production payment and conducted all negotiations with Texas Charities and the First National Bank in Dallas relative to Texas Charities purchasing the primary production payment in the amount of $550,000.00 and the terms under which such purchase was to be made. Under the April 17 letter agreement the Bank was entitled to receive $820,000.00 in cash from FINA, and FINA, by its deposit of the $820,000.00 in escrow, guaranteed the payment of said sum to the Bank. The sale of the primary production payment to Texas Charities enabled FINA to finance $550,000.00 of the purchase price and thus pay only $270,000.00 of its funds toward the purchase price. Accordingly, the economical benefit from the sale of the primary production payment to Texas Charities inured to FINA and not to either the Bank or the estates. It was FINA that prepared the final draft of the assignment of the properties in question from the Bank to FINA, and it was FINA that prepared the instrument by which the primary production payment was conveyed to Texas Charities.

▉ The conveyance of the primary production payment to Texas Charities was simultaneous with the assignment of the properties in question by the Bank to FINA and was a part of an integrated transaction whereby the estates' disposed of their entire working interest in the Good Omen properties for $820,000.00 cash, retaining a secondary production payment in the principal amount of $1,200,000.00. In reserving unto itself the $550,000.00 primary production payment as set forth in its assignment of the Grelling interest in the Good Omen Field to FINA, and in assigning such primary production payment to Texas Charities, it is clear from the evidence in these cases that the Bank did so not only as an accommodation to FINA but as the agent of FINA and the Court so finds.[3] To say that the Bank retained and sold the primary production payment to Texas

3. Regardless of whether the Bank received the $820,000.00 it received in the sale of the Grelling interest in the Good Omen Field in cash directly from FINA or received same in the manner in which it was received, it, under the provisions of 26 U.S.C.A. § 4384, was required to pay, as it did, the transaction tax imposed by 26 U.S.C.A. § 4361 at the rate of 55¢ for each $500 or fractional part thereof on the sum of $820,000.00. Had the Bank assigned the Grelling interest directly to FINA without the retention of the $550,000.00 primary production payment and FINA, upon receiving said assignment, had assigned a $550,000.00 primary production payment to Texas Charities, FINA would have been required to pay a transaction tax on said $550,000.00 at the rate of 55¢ for each $500 or fractional part thereof. Thus, it was a financial benefit of no little consequence to FINA for the transaction, insofar as the $550,000.00 primary production payment is concerned, to be handled in the manner in which it was handled.

Charities is looking only to form and ignoring substance.

█ Looking to the substance of the transaction in question, the Court finds and concludes that the Bank sold the Grelling estates' interest in the Good Omen properties to FINA for $820,000.00 cash, retaining a secondary production payment in the principal amount of $1,200,000.00 on the terms set forth in the letter agreement of April 17; that FINA—not the Bank—sold the $550,-000.00 primary production payment to Texas Charities; and that if the oil payment purchased by Texas Charities were a "carved out" interest within the meaning of the *Lake* case, it was FINA—not the Bank—that carved out such interest. In view of those findings and conclusions, the Court further finds and concludes that the entire gain from the sale in question was properly reported and treated by the Bank as a long-term capital gain, and that the Internal Revenue Service was in error in treating $550,000.00 (the amount of the primary production payment purchased by Texas Charities) of the consideration paid to the Bank as ordinary income subject to depletion.

In light of the above findings and conclusions, it follows that the Plaintiff in each of these cases is entitled to recover from the Defendant the amount of the deficiency assessment and the interest thereon that was paid by the Plaintiff that is attributable to the action of the Internal Revenue Service in treating $550,000.00 of the $820,000.00 paid to the Bank in the transaction in question as ordinary income subject to depletion rather than treating the entire gain from the transaction as a long-term capital gain.

Since the parties to these actions stipulated that if the Court should determine that the Plaintiff was entitled to recover in these cases, the amount of the recovery in each case would be subject to recomputation by the Internal Revenue Service subject to agreement of counsel for the Plaintiff, the parties should undertake promptly a recomputation of the amount of the recovery the Plaintiff is entitled to in each case in light of the findings and conclusions the Court has hereinabove made, and file within 30 days from the date of this Opinion, as a part of the record in these cases, a statement signed by the attorneys for the parties setting forth the amount of the recovery the Plaintiff is entitled to make in each case. Simultaneously, with the filing of such a statement the attorneys for the Bank should present a form of judgment in each of said cases which has been approved as to form by the attorney for the Defendant.

This Opinion, together with the statement as to the amount of the recovery the Plaintiff is entitled to make in each of these cases, which statement is to be filed hereafter as above indicated, will constitute the Findings of Fact and Conclusions of Law in these causes.

SUPPLEMENTAL OPINION SUPPLEMENTING THE OPINION OF THE COURT FILED HEREIN AS THE FINDINGS OF FACT AND CONCLUSIONS OF LAW IN THE ABOVE CAUSES ON APRIL 27, 1966

The Bank has filed in the above causes a motion to amend the findings concerning the $1,200,000.00 secondary production payment made in the twelfth paragraph of the Opinion of the Court filed on April 27, 1966, as the Findings of Fact and Conclusions of Law in these causes, and the Court, having had a hearing on said motion with the attorneys for all parties being present, is of the opinion and finds that said motion is well taken. Therefore, in view of the agreement stated by counsel for the Bank and the Government at the pre-trial hearing had in these causes on December 9, 1965, to the effect that no issue would be raised as to the payout of the said secondary production payment by reason of the cut-off at 109,000 barrels, the Court finds that that issue was conceded by the Government.